**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7408
Facsimile: (212) 989-9163
E-mail: mroberts@bursor.com

**BURSOR & FISHER, P.A.**
Daniel S. Guerra (State Bar No. 267559)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: dguerra@bursor.com
jglatt@bursor.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HENRY YEH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BELKIN INTERNATIONAL, INC.<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Henry Yeh ("Plaintiff") brings this action on behalf of himself, and all others similarly situated against Defendant Belkin International, Inc. ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF ACTION

1. Imagine you buy an Apple Watch. The watch is significantly more expensive than a regular watch that just tells time, but it has all the connectivity and features that come with modern technology. Just a few years later though, Apple decides to remove all the fancy bells and whistles that warranted the higher price, leaving you with a watch that just tells time—something you could have spent mere pocket change on. And rather than paying you the difference between the fancy watch you purchased and the timekeeping-only device you're now stuck with, Apple decides to pay some consumers a pittance and most consumers nothing.

2. This is exactly what will, if not already, happen to thousands of Belkin International consumers, including Plaintiff Henry Yeh when, in July 2025, Defendant decided to end technical support for a number of Wemo products (the "Products"),[1] effective January 31, 2026.[2]

3. That decision means Defendant will disable the "smart" functionality for the Products, which totally barred consumers' access to the products they paid money for. In other words, "most Wemo smart products will turn into paperweights in 2026."[3]

4. Unfortunately, consumers like Plaintiff purchased Defendant's Wemo Products to function as they were advertised—as smart devices they could rely on for "modern living." And they paid a premium price for these "smart" features, as compared to standard devices that can be purchased for far less money. Yet, Defendant is refusing to refund most consumers who purchased

---

[1] The Products are those listed in paragraph 18 of this Complaint.

[2] Belkin, *Wemo Support Ending – What You Need To Know*, available https://www.belkin.com/support-article/?articleNum=335419.

[3] Ben Patterson, *Belkin Essentially Waves Goodbye to its Wemo Smart Home Brand*, PC MAG (July 10, 2025), https://tinyurl.com/y3vdzxm6.

its Products and planning a vague refund program for just a the few its products being impacted—provided the consumer saved their receipt. Such conduct is unfair, unlawful, and in poor taste.

5. Accordingly, Plaintiff brings his claims against Defendant individually and on behalf of a class of all others similarly situated for (1) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.; (2) trespass to chattels; and (3) Unjust Enrichment.

## THE PARTIES

6. Plaintiff Henry Yeh is a citizen of California and resident of South San Francisco, California. Plaintiff purchased a Belkin WeMo Insight Switch in August 2017 from the Verizon website from his previous residence in South San Francisco, California. Plaintiff also purchased a Wemo Mini Smart Plug in July 2017 from Amazon from his current home in South San Francisco, California. Plaintiff purchased these Products for connectivity with Amazon Alexa.

7. When Plaintiff purchased the Belkin WeMo Insight Switch and Wemo Mini Smart Plug, he reviewed the representations and warranties made by Defendant that the Products are "smart plugs" capable of remote control via the Wemo app and through voice assistant integrations. Plaintiff understood he was paying for a device that would have continued functionality. Plaintiff only became aware that his Products' technical support would be shut down—rending them unusable—when alerted by his counsel.

8. Although Plaintiff's Wemo Products will remain operational as regular plugs, they will no longer have "smart" features—the primary reason Plaintiff purchased Defendant's Products when he could have just purchased a non-smart cheaper option—once the Wemo cloud is shut down. Moreover, because Plaintiff's Products are outside of the warranty, he is not eligible for any sort of refund. Thus, Plaintiff has not been adequately compensated for the significantly reduced functionality and value of his Products because of Defendant's actions, and Defendant has been unjustly enriched at Plaintiff's expense.

9. Defendant Belkin International, Inc. is a Delaware corporation with its principal place of business in El Segundo, California. Defendant designs, engineers, markets, manufactures, and sells the Products.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and most members of the proposed class are citizens of different states than Defendant.

11. This Court has general personal jurisdiction over Defendant because it is headquartered in California.

12. This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391 because a substantial part of the acts giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### I. THE RISE OF SMART HOME DEVICES

13. "Home automation first came into people's lives with mechanical systems. Early automation included mechanical thermostats and central heating systems.[4] Following this, so-called "Smart Technology" became the next pursuit in home comfort innovation.

14. "The early 2000s were marked by the rapid increase in the popularity of smart home technology."[5] The desire for smart home technology has only exploded since. By some estimates, the market for smart home devices is projected to pass $100 billion by 2029.[6]

15. To meet this demand, manufacturers have sought to make nearly everything in the home "smart." Consumers can now outfit their homes with just about any "smart" appliance.

---

[4] THE ASSOCIATION FOR SMART HOME PROFESSIONALS, UNDERSTANDING THE HISTORY OF SMART HOMES, (May 22, 2025) https://cedia.org/en-us/homeowners/knowledge/understanding-the-history-of-smart-homes/.

[5] SINHA G. GAURAV, THE EVOLUTION OF SMART HOME TECHNOLOGY, (Apr. 11, 2018), https://blog.bccresearch.com/the-evolution-of-smart-home-technology.

[6] MARKETS AND MARKETS, SMART HOME MARKET SIZE, SHARE & TRENDS BY PRODUCT (LIGHTING CONTROLS, SMART SPEAKER, ENTERTAINMENT, SMART KITCHEN, HVAC CONTROLS, SECURITY & ACCESS CONTROLS), OFFERING (BEHAVIOR, PROACTIVE), SALES CHANNEL, INSTALLATION TYPE AND REGION – GLOBAL FORECAST TO 2029 (Aug. 2024), https://www.marketsandmarkets.com/Market-Reports/smart-homes-and-assisted-living-advanced-technologie-and-global-market-121.html.

Vacuums clean on their own,[7] ice makers can be voice-controlled,[8] and weight scales are Wi-Fi enabled for health tracking.[9]

16. Applicable here, outlets and light switches can be controlled from smartphones or voice assistants, enabling users to control their devices from outside the home or without standing next to the devices.

## II. DEFENDANT'S PRODUCTS DOMINATE THE SMART HOME MARKET AND PROVIDE ADDITIONAL FEATURES AND CONVEIENCE FOR CONSUMERS

17. Belkin is one of the largest players in the home-technology space. Indeed, in March, Belkin celebrated reaching "1 billion products sold and leads as the #1 wireless charging brand."[10]

18. Aside from chargers, Belkin sells its Wemo-brand home smart devices. As Defendant describes them, these Products are the "start" of "modern living."[11] Wemo Products allow consumers to "[u]pgrade [their] space with cutting-edge smart home technology. Securely monitor [their] property in HD with a Wemo smart doorbell, control lighting in multiple rooms with a Wemo smart light switch and remotely power off devices with a Wemo smart plug."[12]

19. Defendant advertises them as the ultimate smart home devices, allowing consumers to "turn electronic devices on or off from anywhere."[13] Belkin even advertises the products as "[working] seamlessly with Amazon Echo and Google Home to give you hands-free, voice control."[14] At issue are Defendant's Wemo products that do not use the Thread standard.

---

[7] Andrew Gebhart, *Ecovacs Deebot X8 Omni Review*, PC MAG (Feb. 28, 2025), https://www.pcmag.com/reviews/ecovacs-deebot-x8-pro-omni.

[8] John R. Delaney, *Ecozy Smart Panel Nugget Ice Maker Mistalo Review: Cool Countertop Convenience,* PC MAG (Sept. 28, 2025) *available* https://www.pcmag.com/reviews/ecozy-smart-panel-nugget-ice-maker-mistalo.

[9] Andrew Gebhart, *Etekcity HR Smart Fitness Scale Review,* PC Mag (June 11, 2024) *available* https://www.pcmag.com/reviews/etekcity-hr-smart-fitness-scale.

[10] Belkin, *Belkin Surpasses 1 Billion Products Sold and Leads as the #1 Wireless Charging Brands* (Mar. 31, 2025), https://www.belkin.com/pr-belkin-surpasses-1-billion-products-sold.html.

[11] Belkin, *Wemo Smart Home,* https://www.belkin.com/products/wemo-smart-home/.

[12] *Id.*

[13] Belkin, *Meet the Wemo Mini Smart Plug, F7CO63*, https://www.belkin.com/support-article/?articleNum=226110.

[14] *Id.*

20. Specifically, Defendant intends to end functionality for its:[15]

(i) Wemo Link

(ii) Wemo Humidifier

(iii) Wemo CrockPot

(iv) Wemo Heater B

(v) Wemo Air Purifier

(vi) Wemo Heater A

(vii) Wemo Coffee Maker (Mr. Coffee)

(viii) Wi-Fi Baby Monitor

(ix) Wemo LED Lighting Bundle

(x) Wemo Motion Sensor

(xi) Wemo Switch + Motion Sensor

(xii) Wemo Maker Module

(xiii) Wemo Zigbee Bulb, E27

(xiv) Wemo Insight V2

(xv) Wemo Switch

(xvi) Wemo Light Switch v2

(xvii) Wemo Insight

(xviii) Wemo Smart Light Switch 3-Way

(xix) Wemo Mini Smart Plug

(xx) Wemo Wi-Fi Smart Light Switch with Dimmer

(xxi) Wemo Smart Light Switch

(xxii) Wemo HomeKit Bridge

(xxiii) Wemo Dimmer Light Switch

(xxiv) Wemo Mini Plugin Switch

(xxv) Wemo Light Switch

[15] Throughout the Complaint, "Products" shall refer to these enumerated Products at issue. Plaintiff's Product that he purchased shall be referred to as the "Product."

(xxvi) Wemo Outdoor Plug; and

(xxvii) Wemo Mini Smart Plug

21. The Products are comprised primarily of "smart" kitchen and home appliances, dimmers and switches, and outlets. Each of Defendant's home appliances operate as "smart devices" and use so-called "cloud connectivity" and remote access to function through the Wemo App. With this connectivity, the Products offer a range of features and convenience that standard, analog competitors do not. Indeed, Defendant represented and warranted to consumers that Defendant's Products are cutting-edge smart home technology that allows the owner "to control and automate things around your home from your phone."[16]

22. As a result, the Products are not cheap. For instance, the Wemo Wi-fi-enabled Mini Start Plug that Plaintiff purchased retails for approximately $23 on Amazon. Conversely, a basic plug extender with multiple outlets but no smart features retails for $10 on Amazon.[17] Likewise, the Wemo Insight Switch that Plaintiff purchased retails for around $20. Conversely, a basic light switch without smart features costs $2.68 at Home Depot.[18]

23. Unfortunately for consumers who both paid for these smart features, Defendant plans to dumb them down, turning the devices into nothing more than their ordinary, analog counterparts.[19]

**A. Defendant's "Smart" Home Appliances**

24. In the kitchen, Defendant's "Mr. Coffee Cup Smart Optimal Brew Coffeemaker with Wemo … allows [the owner] to set the brew time of [their] coffee from anywhere on [their] smartphone with the Wemo App."[20] Likewise, with Defendant's Wemo CrockPot "allows scheduled and unattended cooking using the Wemo App."[21]

---

[16] Wemo Official, *Wemo*, https://wemoofficial.com/.

[17] TROND MULTI WALL OUTLET EXTENDER, https://tinyurl.com/munm27nn.

[18] DECORA 15 AMP SINGLE-POLE SWITCH, https://tinyurl.com/yc6zd88s.

[19] Chance Miller, *Belkin Ending Support for Most of its Wemo Smart Home Accessories*, 9TO5MAC (July 10, 2025) *available* https://9to5mac.com/2025/07/10/belkin-ending-support-for-most-of-its-wemo-smart-home-accessories/.

[20] Belkin, *Meet the Mr. Coffee 10-Cup Smart Optimal Brew Coffeemaker with Wemo, F7C050*, https://www.belkin.com/support-article/?articleNum=117715.

[21] Belkin, *Meet the Crock-Pot Smart Slow Cooker with Wemo*, https://www.belkin.com/support-article/?articleNum=101174.

25. For home comfort, Defendant's humidifier can be controlled through the Wemo App so owners can "manag[e] and maintain[] [their] home's humidity while [they're] away at work, running errands, or even while on vacation. It comes with the Wemo App, which lets you schedule a specific day and time for the humidifier to operate and quickly check and set the humidity level directly from [their] smartphone or tablet."[22]

26. Likewise, with Defendant's air purifier, "[t]hrough the Wemo App, [] can be controlled from anywhere using [the] smart device."[23] The user can also "set schedules" so the purifier is operating at optimal times.[24]

27. Similarly, Defendant's Heater A and B "allow [the owner] to control the thermostat and temperature settings from anywhere to provide warming comfort in [the] home."[25]

**B. Defendant's "Smart" Plugs**

28. Defendant's Products include a series of Smart Plugs. These plugs sit in an outlet and draw power to the plugged device like any other outlet. But, unlike an ordinary outlet, Defendant's Products allow the owner to remotely control the functionality of the device plugged into Defendant's Product (*i.e.*, the user can stop and start charging their device).



**C. Defendant's Dimmers and Switches**

29. Similar to Defendnat's "Smart" plugs, Defndant's dimmers and slight switches

[22] Belkin, *Holes Smart Humidifer with Wemo, F7c046 Frequently Asked Questions*, https://www.belkin.com/my/support-article?articleNum=116193.

[23] Belkin, *Meet the Holmes Smart Air Purifier with Wemo, F7C049,* available https://www.belkin.com/support-article/?articleNum=119228.

[24] *Id.*

[25] Belkin, *Meet the Holmes Smart Heaters with Wemo,* available https://www.belkin.com/support-article/?articleNum=119215.

"allows [users] to control lights and ceiling fans from the wall, the Wemo App, or with [their] voice."[26]

30. When functioning, these Products offer ease and comfort to consumers. Consumers can use their phones to turn on lights before they enter their homes or control lights while on vacation to give onlookers a sense that someone is home; this brings peace of mind and security. Indeed, Defendant promotes these benefits on its website.[27]

**D. Connecting Defendant's Products To The Wemo App, Amazon Alexa, And Google Home**

31. The "smart" functionality of Defendant's Products begins with the Wemo App. A consumer can pair the Products to their account either manually and control the Products wholly through the Wemo App, or connect them to a Google Home, Amazon Alexa, or through Defendant's integration with Apple's "HomeKit" for additional features like voice control—a feature the Wemo App does not offer.

32. For a manual sync, if the consumer already has the devices paired to their account, those devices will appear synced after log-in.[28] If not, the user is directed to "Add a new Wemo":




[26] Belkin, *Wemo Smart Light Switch 3-Way,* available https://www.belkin.com/id/p/smart-light-switch-3-way/WLS0403-BDL.html.

[27] Wemo, *Wemo Smart Plug,* https://wemoofficial.com/wemo-smart-plug ("Randomly turn lights on/off to deter intruders when you're away.").

[28] BELKIN, WEMO SETUP, https://www.belkin.com/support-article/?articleNum=8218.

33. Once plugged into the wall, the Products must be connected to WiFi and synced with a consumer's Wemo account. Once paired with the consumer's Wemo account, the consumer can use their phone to switch devices on and off:




34. Products synced through this method rely on the Wemo Cloud services to function through the Wemo App.

35. Some Wemo Products also integrate with Apple's "HomeKit" framework. Through HomeKit, the user can control these Products through the Apple Home App. With this, Apple features like Siri voice control can be used to control these Products.

36. Just like with the manual sync, when setting up these Products through HomeKit, the user starts through the Wemo App. The user is directed to scan the QR code and follow directions to merge with Apple's platform.[29]

37. A similar process is true for Amazon Alexa. Once the user has activated their Wemo product, the user can open their Amazon Alex app and search for their specific product. After following a 10-step connection process, and linking their Wemo account to their Amazon Alexa account, the device becomes Alexa-enabled.

[29] *Id.*

38. Consumers link their Wemo accounts with their Amazon Alexa accounts to enable voice control.

39. Likewise, with Google Home, the consumer must first have a functional Wemo Product. After connecting that Product through the Wemo account, the consumer can pair it within their Google Home App.

40. Belkin states that its products are cutting-edge smart home technology that allows the owner "to control and automate things around your home from your phone."[30] After January—despite having paid for its Products for that purpose—Defendant's unilateral decision to disrupt its Products' function means this is no longer true.

## III. BELKIN SHUTS DOWN WEMO SUPPORT

41. On July 10, 2025, Defendant announced it would shut down technical support for older Wemo products, effective January 31, 2026.[31]

42. In making this announcement, Defendant explained that "[o]nce the Wemo cloud is shut down, any features that rely on cloud connectivity, including remote access and voice assistant integrations will no longer work."[32] The result of the shutdown will be the disablement of consumers' ability to use the cloud functionality central to their devices.

43. This inspired consumers who purchased and use Defendant's Products, to vocalize their frustration:







---

[30] Belkin, *Wemo*, https://wemoofficial.com/.

[31] *Id.*

Belkin, *Wemo Support Ending – What You Need To Know*, July 10, 2025 (last accessed Dec 22, 2025), https://www.belkin.com/support-article/?articleNum=335419.

[32] *Id.*


Phillymontana • 28d ago

Is there any opportunity to get the dimmer switches to work with any other apps, or create my own server that will allow my switches to work over wifi.

Might be wishful thinking, but this is a huge bummer. I paid a lot of money for these switches.

1 Reply Award Share ···

44. The surprise shutdown is set to impact Products running on Wemo's Cloud—like those controlled through the Wemo App—as well as "Alexa and Googe Assistant integrations [which] will be deactivated too. Belkin also advises deleting the Wemo app after the shutdown date, as it will no longer receive updates."[33]

45. Interestingly, some consumers have already reported their Products—and the underlying software used to run them—have been bricked:


OnerKram17 • 3mo ago

As of 10-7-25 my Wemo app is dead. Plugs now worthless 😡

1 Reply Award Share ···


Medium_Swan3959 • 3mo ago

Don't buy any Belkin products Have a number of mini plugs that no longer work on the Wemo app.

1 Reply Award Share ···

46. Defendant claims that "[i]f your device is still under warranty and you have proof of purchase, you may be eligible for a partial refund beginning January 31, 2026."[34] This is not adequate. Many consumers like Plaintiff have Products that are still perfectly functional but are outside the warranty period. Thus, such consumers lack *any* remedy at all through the refund. Moreover, it is not clear whether Defendant's "refunds" will fully compensate consumers for the premium price they paid for the smart features. Finally, the refund is discretionary and requires proof

[33] Patterson, *supra*.

[34] BELIKIN, WEMO SUPPORT ENDING – WHAT YOU NEED TO KNOW (July 10, 2025), https://www.belkin.com/ca/support-article/?articleNum=335419.

of purchase, which consumers may not have.

47. Defendant also claims that Apple HomeKit users can continue to use some Wemo Products with their "smart" features.[35] But Defendant's explanation is both vague and contradictory. Defendant seems to suggest that all the smart features will work with Apple HomeKit while, at the same time, identifying only a specific few that it claims would continue to work Products with HomeKit connectivity. Defendant states:

> Wemo products configured for use with Apple HomeKit prior to January 31, 2026 will continue to function via HomeKit in the absence of Wemo cloud services and the Wemo app. *This shutdown does not affect the functionality of Wemo's Thread-based products* – model numbers WLS0503, WSC010, WSP100, WDC010 – which will continue to function as they do today through HomeKit.[36]

This leaves consumers unclear as to whether the shutdown will not impact any Products compatible with HomeKit, or only those models.

## CLASS ALLEGATIONS

48. Plaintiff seeks to represent a **Nationwide Class** defined as all persons in the United States who purchased the Products for personal use.

49. Plaintiff also seeks to represent a **California Subclass** defined as all persons in the who purchased the Products in the State of California for personal use.

50. Unless otherwise specified, the Nationwide Class and California Subclass shall collectively be referred to as the "Classes."

51. Excluded from the Classes are Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, any Judge and/or Magistrate Judge to whom this action is assigned, and any member of such Judges' staff and immediate families, Defendant's Counsel, and Plaintiff's Counsel.

52. ***Numerosity*:** Members of the Classes are so numerous that their individual joinder herein is impracticable. On information and belief, the Classes include thousands of consumers. The precise number of Class members and their identities are unknown to Plaintiff at this time but will

[35] *Id.*

[36] *Id.* (emphasis added).

be determined through discovery. Class Members may be notified of the pendency of this action by mail, email, and/or publication.

53. ***Commonality and Predominance*****:** Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members. These common legal and factual questions include, but are not limited to:

(i) Whether Defendant's actions rendered the Products inoperable or obsolete;

(ii) Whether Defendant's conduct was unfair or unlawful;

(iii) Whether Defendant trespassed to chattels;

(iv) Whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the Classes; and

(v) Whether Plaintiff and the Classes sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages.

54. ***Typicality:*** Plaintiff's claims are typical of the claims of the proposed Classes he seeks to represent because Plaintiff, like all members of the Classes, purchased the Products and paid a premium price for them because of their "smart" features, which will be, if not already, disabled because of the Wemo cloud shutdown. Thus, Plaintiff, like all members of the Classes, has been damaged by Defendant's misconduct in the very same way as the members of the Classes. Further, the factual bases of Defendant's misconduct are common to all members of the Classes and represent a common thread of misconduct resulting in injury to all members of the Classes.

55. ***Adequacy:*** Plaintiff is an adequate representative of the Classes he seeks to represent because his interests do not conflict with the interests of the members of the Classes, he has retained counsel competent and experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of the members of the Classes will be fairly and adequately protected by Plaintiff and his counsel.

56. ***Superiority*****:** A class action is superior to other available means for the fair and efficient adjudication of the claims of the members of the Classes. Each individual member of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the

complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also represents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

57. Defendant has acted or failed to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the Classes as a whole.

58. Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and Members of the Classes, and Defendant will likely retain the benefits of wrongdoing.

## **CAUSES OF ACTION**

### **COUNT I**
### **Violation of California's Unfair Competition Law**
### **Cal. Bus. & Prof. Code §§ 17200, *et seq.*,**
### **(On Behalf of the Classes)**

59. Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

60. Plaintiff brings this claim individually and on behalf of the Classes against Defendant.

61. Defendant violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 – 17210, by engaging in unfair and unlawful business practices.

62. Plaintiff has standing to pursue this claim because he suffered an injury-in-fact and lost money or property because of Defendant's unlawful and unfair conduct.

63. Defendant violated the UCL's proscription against engaging in **unlawful business practices** because of Defendant's unjust enrichment and trespass to chattels.

64. Defendant's acts and practices alleged above also violated the UCL's proscription against engaging in **unfair business practices**. A business act or practice is "unfair" if it offends an

established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. That unfairness is determined by weighing the reasons, justifications, and motives for the business act or practice against the gravity of the harm alleged.

65. Defendant's conduct constitutes an "unfair" business practice because, as alleged herein, (i) Defendant charged consumers a premium price for the Products based on their "smart" features; (ii) Defendant intends to, if it has not already, disable the "smart" features of the Products, thereby rendering them worth significantly less than what Plaintiff and Members of the Classes paid for the Products; and (iii) Defendants did not provide Plaintiff and Members of the Classes with adequate compensation (if any compensation) for this disablement.

66. Defendant's conduct, as alleged herein, was not motivated by any legitimate business or economic need or rationale. No legitimate reasons, justifications, or motives for rendering inoperable the advertised features of Plaintiff's and Members of the Classes' paid-for Products outweigh the harm and adverse impact of Defendant's conduct on Plaintiff and members of the general public. Defendant engaged in such conduct solely to wrongfully extract monies from reasonable consumers seeking to own a smart device, to which Defendant is not entitled. Defendant could have, but has not, used alternative means of affecting its legitimate business needs.

67. Defendant's conduct harmed consumers and hurt market competition. Defendant's conduct, as alleged herein, is immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and Members of the Classes because it violates consumers' reasonable expectations of what it means to pay for a smart device.

68. As a direct and proximate result of Defendant's unfair practices, Plaintiff and Class Members were deprived of their benefit of the bargain with Defendant and suffered substantial injury in fact, and lost money and/or property. The injuries suffered by Plaintiff and Members of the Classes include, but are not limited to, diminution in the value of their personal property associated with the loss of the functionality of their Products.

69. Plaintiff and Members of the Classes could not have reasonably avoided their injury or known that the Products' central features were to be rendered obsolete by Defendant's actions

after having purchased and used the Products for their intended purposes. As such, they could not have reasonably avoided the injury they suffered.

70. Plaintiff and the Members of the Classes do not have an adequate remedy at law. Legal remedies available to Plaintiff and the members of the Classes are inadequate because they are not equally prompt and certain and in other ways as efficient as equitable relief. Damages are not as equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff failed to sufficiently adduce evidence to support an award of damages. Damages and restitution are not the same amount. Equitable relief, including restitution, entitles Plaintiff to recover all profits from the wrongdoing, which may exceed the available damages at law.

71. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and the Classes seek an order of this Court that includes, but is not limited to, requiring Defendant to (i) provide restitution to Plaintiff and the other members of the Subclass; (ii) disgorge all revenues obtained as a result of violations of the UCL; and (ii) pay Plaintiff's attorneys' fees and costs.

**COUNT II**
**Trespass to Chattels**
**(On Behalf of Plaintiff and Classes)**

72. Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

73. Plaintiff brings this claim individually and on behalf of the Classes against Defendant.

74. Plaintiff and Members of the Classes maintained actual or constructive possession of their Wemo Products up to and including January 31, 2026, the date Defendant rendered the Products "smart" functionality inoperable.

75. Plaintiff and Members of the Classes did not consent to Defendant's interference with their Wemo Products.

76. Defendant's interference was the actual and proximate cause of injury to Plaintiff and California Subclass Members because it actually and substantially intends to harm the functioning of the Products by rendering the "smart" functionality inoperable. This harm to the "smart" capabilities significantly impaired the Products' condition, quality, and value. Defendant's

interference will also permanently deprive Plaintiff and Members of the Classes of the full scope of use of their personal property—features they paid for and formed the basis of the bargain—by disabling the "smart" functionality.

77. Defendant actions are taken with conscious disregard for the rights of Plaintiff and Members of the Classes and knew its actions would cause harm to the Products' core functionality.

78. As a result of Defendant's interference with the Products' abilities, Plaintiff and Members of the Classes are entitled to recover actual damages in an amount to be determined at trial.

**COUNT III**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Classes)**

79. Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in the preceding paragraphs of this Complaint.

80. Plaintiff brings this claim individually and on behalf of the Classes against Defendant.

81. Defendant has been unjustly enriched by retaining the revenues derived from Plaintiff and Members of the Class purchases of Defendant's Products.

82. Defendant has been unjustly enriched by retaining the revenues derived from Plaintiff and the Class Members' purchases of the Products. Retention of those moneys under these circumstances is unjust and inequitable because Defendant rendered, or will render, the "smart" qualities of the Products—a critical component and basis of the bargain—inoperable by discontinuing the Cloud, Wemo App, Amazon Alexa, Google Home, and voice control support for the Products.

83. Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class Members is unjust and inequitable, Defendant must pay restitution to Plaintiff and Class Members for its unjust enrichment, as ordered by the Court.

84. Plaintiff and the Members of the Classes do not have an adequate remedy at law. Legal remedies available to Plaintiff and the members of the Classes are inadequate because they are not equally prompt and certain and in other ways as efficient as equitable relief. Damages are not as equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that

Plaintiff failed to sufficiently adduce evidence to support an award of damages. Damages and restitution are not the same amount. Equitable relief, including restitution, entitles Plaintiff to recover all profits from the wrongdoing, which may exceed the available damages at law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(i) For an order certifying the Classes under Fed. R. Civ. P. 23, naming Plaintiff as the representative of the Classes, and naming Plaintiff's attorneys as Class Counsel;

(ii) For an order declaring the Defendant's conduct violates the statutes referenced herein;

(iii) For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(iv) For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(v) For pre-judgment interest on all amounts awarded;

(vi) For an order of restitution and all other forms of equitable monetary relief;

(vii) For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: January 26, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Max S. Roberts*
Max S. Roberts

Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7408
Facsimile: (212) 989-9163
E-mail: mroberts@bursor.com

**BURSOR & FISHER, P.A.**
Daniel S. Guerra (State Bar No. 267559)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: dguerra@bursor.com
jglatt@bursor.com

*Attorneys for Plaintiff*